# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|                                    |                            |
|------------------------------------|----------------------------|
| **DOUBLE R. RANCH TRUST** *et al.*,|                            |
| Plaintiffs,                        |                            |
| v.                                 | Case No. 17-cv-438 (CRC)   |
| **MICHAEL D. NEDD**[1] *et al.*,   |                            |
| Defendants.                        |                            |

## MEMORANDUM OPINION

Under the Wild and Scenic Rivers Act, Congress can designate certain rivers in the United States for statutory protection intended to preserve the river's flow, water quality, and other natural, recreational, or cultural attributes. This case concerns the conclusion by the Medford, Oregon district of the Bureau of Land Management ("Bureau") that a segment of the Rogue River in Oregon is suitable for Congress to designate for future protection under the Act. Plaintiffs contend that this decision is flawed and here sued the Bureau's Acting Director seeking its reversal. But because the Bureau's suitability determination is but one step in a long and unpredictable process towards potential congressional designation, and because they fail to allege an injury-in-fact that is traceable to the suitability determination itself, Plaintiffs lack standing to challenge that determination. The Court will, accordingly, grant Defendants' motion to dismiss for lack of subject matter jurisdiction.

---

[1] Acting Director Michael Nedd, as former Acting Director Kristin Bail's successor, has been automatically substituted as a defendant pursuant to Fed. R. Civ. P. 25(d).

I.   **Factual and Statutory Background**

   A.  <u>The Wild and Scenic Rivers Act</u>

The Wild and Scenic Rivers Act, passed by Congress in 1968, serves to protect free-flowing rivers that "possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values."  16 U.S.C. § 1271.  Such rivers are to be "preserved in free-flowing condition" so that "they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations."  <u>Id.</u>  Each river designated for protection under the act is classified as either a wild, scenic, or recreational river.  <u>Id.</u> § 1273(b).  Together, these rivers form the national wild and scenic rivers system.

When Congress first passed the Act, it included a list of rivers designated for protection.  See <u>id.</u> § 1274(a).  Additional rivers can be so designated by an act of legislation.  <u>Id.</u> § 1273(a)(i).[2]  The Secretary of the Interior and the Secretary of Agriculture are further directed to conduct a study of certain other rivers and make a recommendation to Congress as to whether those rivers should be designated for protection by legislative act.  <u>Id.</u> § 1275(a); <u>see also</u> <u>id.</u> § 1276(a) (listing the congressionally-mandated study rivers).  The Act also directs federal agencies to consider other potential national wild, scenic, and recreational rivers within lands under their jurisdiction and to make recommendations regarding potential designations to Congress.  <u>Id.</u> § 1276(d)(1).

---

[2] A river can also be designated by an act of legislation by the States through which the river flows and a finding by the Secretary of the Interior, upon application of the requisite State Governors, that the river meets the statutory criteria for designation.  16 U.S.C. § 1273(a)(ii).  These rivers are sometimes referred to as "Secretarial-designated rivers."  This alternate method of designation is not at issue here.

The study process for both congressionally-mandated study rivers—those that Congress has directed for study—and agency-identified study rivers—those that agencies choose to study absent congressional direction—is the same. The process involves two main phases: eligibility and suitability. First, the agency determines if the river is eligible for designation. Defs.' Mem. Supp. Mot. Dismiss ("Def.'s MTD") Ex. C ("Study Manual"), at 12. For eligibility, the main question is whether the river meets the statutory requirements to be free-flowing and to possess one or more "outstandingly remarkable values." Id. If the agency determines that a river is eligible, it assigns a tentative classification to the river—either as a wild, scenic, or recreational river. Id. at 15.

Next, if the river is found eligible, the agency determines if it is suitable for designation. Id. at 17. The "suitability" analysis focuses on three questions: (1) whether the river's free-flowing character, water quality, and outstanding values should be protected in light of any other important uses of the river; (2) whether the river's free-flowing character, water quality, and outstanding values will be protected through designation, considering the costs and benefits of doing so; and (3) whether there is a demonstrated commitment to protect the river by nonfederal entities who might share in its protective management. Id.

If an agency determines that a river is suitable for designation, the river then undergoes the recommendation process. Id. at 19–21. With respect to congressionally-mandated study rivers, the responsible federal agency's staff prepares a formal study report, which is subject to a 90-day review by the Secretary of the Interior or Agriculture (depending on which agency prepared the report), the Secretary of the Army, the Chairman of the Federal Energy Regulatory Commission, the Governors of the States where the river is located, and the heads of any other affected federal departments or agencies. Id. at 19–20. The study result and the relevant

comments are transmitted to the President, who then delivers the report to Congress. Id. at 20. For agency-initiated study rivers, the recommendation by the agency is first made through a record of decision for an environmental impact statement, which follows a notice-and-comment process. Id. at 21. A draft bill and the report are then reviewed by the Office of Management and Budget before being transmitted by the Secretary of the Interior or the Secretary of Agriculture to Congress. Id. In the end, however, only Congress can designate recommended rivers by passing a legislative act. See 16 U.S.C. § 1273(a)(i).

To ensure that designated rivers are adequately preserved, the Act created a variety of statutory protections, including a prohibition on the licensing of any dam along the river, id. § 1278(a); limitations on agency authorization of "any water resource project that would have a direct and adverse effect" on the river's values, id.; restrictions on mining rights on federal lands within one-quarter mile of protected rivers, id. § 1280(a); and removal of any federal land containing protected rivers and their associated lands from sale, id. § 1279(a). Federal agencies and departments are generally instructed to manage designated rivers and their associated lands to protect the rivers. Id. § 1283(a).

The Act also extends some of these protections accorded designated rivers to congressionally-mandated study rivers during the study period and prior to any designation. For instance, the prohibition on licensing dams or other projects along the river that "would have a direct and adverse effect" on the river's values extends to congressionally-mandated study rivers. Id. § 1278(b). Similarly, restrictions on mining on federal lands, id. § 1280(b), and on the sale of federal lands within a designated river and its area, id. § 1279(b), extend to congressionally-mandated study rivers. In contrast, an *agency*-identified study river "*is not* protected under the Act." Study Manual at 21; see also id. at 26–28. However, agencies can use their pre-existing

4

authorities—such as those under the Federal Land Management and Planning Act, the Endangered Species Act, or the Clean Water Act—to try to preserve the free-flowing nature, water quality, and outstanding values of the river so that it remains suitable or eligible for designation. Id. at 21, 29–30.

B. The Rogue River suitability determination

The Rogue River, located in southwestern Oregon, flows more than 200 miles from the Cascade Range to the Pacific Ocean. One segment of the Rogue, totaling 84.5 miles, was designated for protection as a wild and scenic river with the original passage of the Wild and Scenic Rivers Act in 1968. See 16 U.S.C. § 1274(a)(5). An additional segment, this one stretching 40.3 miles, was designated for protection by Congress in 1988. See id. § 1274(a)(104).

This case concerns the potential designation of a third segment of the Rogue River. In 1990, the Western Oregon divisions of the Bureau completed the first phase of the study process for the rivers in western Oregon and determined that fifty-one river segments, including a third section of the Rogue, were eligible for designation. Defs.' MTD Ex. F, at 1. The Western Oregon divisions proceeded to the second phase of the study process, a determination of whether the fifty-one river segments were also suitable for designation. Id. at 1, 4–5. In August 2016, the divisions reached their final determinations, concluding that six of the fifty-one river segments met the criteria for suitability. Id. at 6. One of those six rivers was a 63.2 mile segment of the Rogue River (the "Proposed Segment"), which had been tentatively classified as a recreational river. Id. at 121–38.[3]

---

[3] At this time, the recommendation of the Medford District—which has jurisdiction over the Proposed Segment—is still being reviewed by the Bureau's Oregon State Director. See

A group of plaintiffs subsequently filed suit against the Acting Director of the Bureau of Land Management and the Secretary of the Interior, seeking to vacate the Medford District's determination that the Rogue River segment was eligible and suitable for recommendation for designation. Compl. ¶ 1. The plaintiffs consisted of Double R Ranch Trust, the owner of property alongside the Rogue River and Proposed Segment, id. ¶ 4; the Oregon Cattleman's Association, a nonprofit trade association representing the interests of Oregon cattle producers, id. ¶ 8; and the Oregon Concrete and Aggregate Producers Association, a trade association representing the concrete industry, id. ¶ 12. They alleged that the suitability determination was arbitrary and capricious under the Administrative Procedures Act ("APA") and sought a declaration that the Proposed Segment was neither eligible nor suitable for designation. Id. ¶¶ 71, 73.

Defendants moved to dismiss, arguing that the Plaintiffs lack standing, that there is no final agency action as required for review under the APA, and that the case is not ripe for review. See generally Defs.' MTD. The Court held a hearing on December 18, 2017. After considering the arguments raised by the parties in their briefs and at the hearing, the Court will dismiss this case for lack of standing.[4]

---

Defs.' MTD at 20–21. It will then need to be reviewed by the Director of the Bureau before it is transmitted for review by the Secretary of the Interior. Id. at 20.

[4] Prior to the motion to dismiss, conservation groups Rogue Riverkeeper and American Rivers, and Stuart Warren, a fishing guide along the Rogue River (collectively "prospective Defendant-Intervenors"), filed a motion to intervene in support of the Bureau. The Court allowed the prospective Defendant-Intervenors to file a brief supporting the motion to dismiss and to participate at the December 18, 2017 hearing as amicus curiae. See Minute Order (Dec. 4, 2017); Minute Order (Nov. 17, 2017).

## II. Legal Standard

Standing is a fundamental prerequisite to federal jurisdiction under Article III. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). The Supreme Court has established that the "irreducible constitutional minimum" for standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. (citation omitted). The plaintiff bears the burden of establishing each of these elements. Id.

The first element—injury in fact—requires that the plaintiff "show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (citation omitted). The second element—causation—necessitates a "causal connection between the injury and the conduct complained of," rather than the injury being the result of "the independent action of some third party not before the court." Lujan v. Def. of Wildlife, 504 U.S. 555, 560 (1992) (citation omitted). The final requirement—redressability—simply means that "it must be 'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (citation omitted).

When evaluating standing at the motion to dismiss stage, as here, it suffices that the plaintiffs "state a plausible claim" that the requirements of standing are met. Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted). In addition, the Court will "accept the well-pleaded factual allegations" in the complaint "as true and draw all reasonable inferences from those allegations in the plaintiff's favor." Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015). However, the Court will not "assume the truth of legal conclusions" nor will it "accept inferences that are unsupported by the facts set out in the complaint." Id. (citation

omitted). Finally, in considering a motion to dismiss for lack of standing, the Court may look to materials outside of the complaint, such as a plaintiff's sworn declaration. Food & Water Watch, 808 F.3d at 913.

### III. Analysis

The government contends that Plaintiffs lack standing because their alleged injuries are too speculative and, in any event, are not traceable to the challenged determination. The Court agrees.

Overall, Plaintiffs assert two main types of injuries: those that flow from congressional designation and those that flow from the Bureau's "protective management" regime for suitable rivers. But the injuries that Plaintiffs point to that are sufficiently specific for standing—which the Court will detail below—will arise only if the river is designated; their allegations concerning injuries from the suitability determination itself are too conclusory and general. Thus, the only injuries on which Plaintiffs could sustain standing are those that relate to designation, namely future activities Plaintiffs argue they might seek to undertake but may be precluded from conducting because of the statutory protections for designated rivers.

Yet the ultimate designation of the Proposed Segment (and thus any injury Plaintiffs might suffer from that designation) is far from certain. In order for their specific injuries to materialize, (1) the Medford District's conclusion needs to be approved by both the Bureau's Oregon State Director and the National Director, who would then pass the suitability recommendation on to the Secretary of Interior; (2) the Secretary must also agree with the Medford District's suitability conclusion and make a recommendation to Congress to designate the Proposed Segment; (3) Congress must agree and pass a legislative act designating the Proposed Segment for protection; (4) the President must sign that legislation; (5) Plaintiffs must

seek to undertake a desired action; and (6) an agency must refuse to permit or otherwise prevent them from undertaking that action. Plaintiffs themselves recognize that their injuries involve this lengthy chain of causation, explaining that their desired relief will redress their injuries because "then the Segment will not be recommended for designation and permitting agencies will not be bound by the restrictions that flow from designation." Pls.' Mem. P. & A. Opp'n Defs.' Mot. Dismiss ("Pls.' Opp'n"), at 18–19.

In light of this long chain of events running from the challenged suitability determination to the concrete injuries that Plaintiffs have alleged—the preclusion of activities they may later seek to undertake—Plaintiffs lack standing for two reasons: (1) such an attenuated chain of causation, involving as it does the independent actions of third parties, reveals that the alleged injuries are not fairly traceable to the challenged action; and (2) in light of the many links in the chain and Plaintiffs' inability to establish that each event has a substantial likelihood of occurring, Plaintiffs do not allege an injury that is sufficiently imminent to constitute an injury-in-fact. The Court will elaborate below.

A. <u>Plaintiffs' specifically-identified injuries are all a consequence of designation, not the suitability determination.</u>

1. *Most of Plaintiffs' identified injuries flow from designation.*

In their complaint, Plaintiffs assert a number of specific actions they may seek to undertake that might be precluded. Generally, these potential prohibitions fall into four groups: (1) the loss of permits from the Army Corps of Engineers to conduct activities such as streambank stabilization, installation of riprap, construction of new or replacement points of diversion, maintenance of levees, and the sales of mineral deposits; (2) the loss of water rights, both existing and potential future ones; (3) the loss of grazing permits; and (4) the loss of mining permits from the Oregon Department of Geology and Mineral Industries. See Pls.' Opp'n at 7–

9

14. But for each of these asserted activities, the roadblocks that Plaintiffs point to arise from the statutory protections for designation, not the Bureau's suitability finding.

*Loss of permits from the Army Corps of Engineers*: Plaintiffs allege they are injured because they will be unable to obtain permits from the Army Corps of Engineers to continue or begin a variety of activities on or near the Proposed Segment, such as streambank stabilization and mineral sales. Compl. ¶¶ 5, 9, 12, 44, 45; Decl. of Rich Angstrom ¶¶ 4, 7. This will happen, they say, because of section 1278(a) of the Act, which forbids the Army Corps of Engineers (or any federal agency) from authorizing projects that "would have a direct and adverse effect on the values for which" a river was designated, 16 U.S.C. § 1278(a). Pls.' Opp'n at 8, 11.

But section 1278(a) only applies to *designated* rivers. See 16 U.S.C. § 1278(a) (limiting agency approval of permits for activities "on or directly affecting any river *which is designated* . . . as a component of the national wild and scenic rivers systems" (emphasis added)); see also 33 C.F.R. § 320.4(e) (Corps of Engineers regulation stating that it will give "due consideration" to a proposed permit activity's effect on "wild and scenic rivers" when evaluating the permit). And while section 1278(b) imposes similar protections on *congressionally*-mandated study rivers, the statute is silent as to any protection for *agency*-identified study rivers. Indeed, the technical agency manual that Plaintiffs cite in support of their standing argument itself says that section 1278 only applies to projects impacting "a *designated* river or *congressionally authorized* study river." Pls.' Opp'n Ex. A, at 4 (emphases added). At the hearing all parties seemed to agree that section 1278 does not apply here.

As a consequence, Plaintiffs point to no bar to their ability to receive future permits that arises from this suitability determination. In fact, Plaintiffs' complaint suggests that they have been able to obtain any necessary permits from the Army Corps of Engineers while the Proposed

10

Segment has been under the same protective management as an eligible river. See Compl. ¶ 31 (Double R Ranch installed rip-rap along the riverbank in 2008); id. ¶ 30 (another property owner installed rip-rap along the riverbank in 2006 and 2009). Thus, Plaintiffs' alleged inability to obtain future permits from the Army Corps of Engineers will arise only upon the river's designation.

*Loss of water rights*: Plaintiffs further contend that they are injured because their "ability to make future changes to existing water rights" and "to apply for new water rights" "will be curtailed by designation of the Proposed Segment." Compl. ¶ 6; see also Pls.' Opp'n at 9–10. They point to section 1284(d) as the basis for this contention, which limits state jurisdiction over river waters if that jurisdiction cannot be exercised "without impairing the purposes of" the Act, 16 U.S.C. § 1284(d). Pls.' Opp'n at 10. But again, this section applies to state jurisdiction over waters *within a designated river*. The statute provides no indication that section 1284(d) has any impact whatsoever on state law or state jurisdiction over study rivers such as the Proposed Segment. Similarly, the Oregon regulation that Plaintiffs say will limit their ability to transfer water rights discusses transfers involving "federal wild and scenic rivers," which would not include agency-identified study rivers. Or. Admin. R. 690-315-0040(4)(b). Plaintiffs offer no basis for concluding that Oregon's jurisdiction over the Proposed Segment or their water rights is affected by the suitability determination, again indicating that any roadblocks to their ability to transfer water rights will be erected only upon designation.

*Loss of grazing permits*: Plaintiffs further contend they are injured because of limitations on their ability to "effect routine management practices on their lands, including vegetation management and livestock grazing," and because they might lose access to grazing permits on federal lands. Pls.' Opp'n at 8; see also Decl. of Jerome Rosa ¶¶ 4–5. But they again point to

11

section 1278(a) as the impediment to such permits being renewed. See Pls.' Opp'n at 11 (stating that permit "authorizations and renewals are governed by the 'unreasonably diminish' standard in [section 1278(a)]"). As discussed above, section 1278(a) has no impact on federal agencies unless and until the Proposed Segment is designated. Nor do Plaintiffs point to any independent barriers to the renewal of permits, indicating that as with their other alleged injuries, the loss of grazing permits will occur only if the Proposed Segment is designated.

*Loss of mining permits*: Plaintiffs finally contend that they are injured because they will be prevented from obtaining or renewing mining rights from the Oregon Department of Geology and Mineral Industries. Decl. of Rich Angstrom ¶¶ 5–6. But Plaintiffs point to nothing indicating that any such issues might arise except following designation. To the extent that section 1284(d) might require changes in Oregon mining rights—a proposition that is itself uncertain, given that that provision applies to a State's jurisdiction "over *waters of any stream*," not to State jurisdiction over land and the regulation thereof, 16 U.S.C. § 1284(d) (emphasis added)—that statutory provision does not apply to study rivers, as discussed above. And Plaintiffs identify no other statutory or regulatory provision indicating that Oregon has any obligation or intention to alter its mining rights and permitting processes because of a suitability determination on an agency-identified study river. Once more, the roadblocks Plaintiffs rely upon would seemingly be erected only upon designation.[5]

Overall, Plaintiffs' complaint and briefing is replete with references to the negative consequences of designation. See, e.g., Pls.' Opp'n at 8 ("Following designation, any activities

---

[5] Plaintiffs also assert economic loss or lost property value as an injury. See Pls.' Opp'n at 12–14. But this loss is a consequence of the other asserted injuries, such as loss of water rights or future permits. As such, it too would follow from designation rather than a suitability determination alone.

under Army Corps jurisdiction will be blocked by Section 7(a) of the WSRA. . ."); id. at 9 ("Designation will have an immediate, adverse effect on normal agricultural operations on Double R Ranch . . ."); id. at 10 ("Designation of the Proposed Segment would cause Plaintiffs economic harm . . ."); Compl. ¶ 6 ("The Ranch's ability to make further changes to existing water rights, and its ability to apply for new water rights from the Rogue River, will be curtailed by designation of the Proposed Segment. . ."). And ultimately, all of the specifically-identified injuries that Plaintiffs point to arise from the river's designation, not directly from the river's suitability determination.

> 2. *Plaintiffs allege no specific injuries that follow from the suitability determination alone, absent designation.*

Plaintiffs do generally allege that they are injured by the "protective management" of the Proposed Segment by the Bureau. Pls.' Opp'n at 14–17. As previously noted, federal agencies—like the Bureau—can use their other authorities, such as those under the Clean Water Act or the Federal Land Management and Planning Act, to try to preserve the characteristics of study rivers so they remain eligible or suitable for designation by Congress. See Study Manual at 21, 29–30. The Bureau's manual states that the Bureau has "broad discretionary authority, on a case-by-case basis through project-level decisionmaking and the [National Environmental Planning Act] process, not to impact [study] river values or make decisions that might lead to a determination of ineligibility or nonsuitaiblity." Pls.' Opp'n Ex. C, at 3-8.

In theory, a party could maintain standing by alleging a specific project under the Bureau's review that would be precluded by the protective management imposed by the Bureau as a result of a suitability determination. But Plaintiffs make no such specific, concrete allegation here. They do not say, for instance, that they are undertaking a project on federal lands that will require the Bureau's authorization in a way that might be impacted by protective

13

management.  Rather, Plaintiffs primarily point to decisions that are under the jurisdiction and purview of *other* agencies, such as the Army Corps of Engineers or the Oregon Department of Geology and Mineral Industries, and to their concerns over section 1278(a)—which, as noted above, does not apply to an agency-identified river prior to designation.  And while the Bureau might have some ability to influence the decisions of other agencies—by commenting to the Army Corps of Engineers on pending permit applications, for instance—the Bureau has no statutory or regulatory authority to *prevent* those agencies from granting permits absent a designation decision.  Nor do Plaintiffs, as explained above, point to barriers to those other agencies' actions in the absence of designation.[6]

Plaintiffs generally contend that the suitability determination will make the regulatory process more complicated and less certain, but never explain *how* that happens in the absence of designation or what *specific* activities they seek to undertake that are (again, absent designation) made more complicated, less certain, or more expensive.[7]  Such conclusory allegations unmoored from specific, concrete facts are insufficient to establish an injury for standing purposes.

---

[6] The prospective Defendant-Intervenors have pointed to one limitation that the Bureau appears to apply to suitable rivers and adjacent lands under the Bureau's jurisdiction, namely a limitation on "leasable fluid minerals."  Rogue Riverkeeper's Mem. Supp. Def.'s Mot. Dismiss Ex. B, at 241.  Counsel at the hearing stated this limitation covers oil and gas leases, and does not encompass any of the planned activities on which Plaintiffs rely to establish standing.

[7] This contrasts with cases that Plaintiffs cite where specific actions were alleged to be directly affected by the challenged agency action.  See, e.g., Nat'l Mining Ass'n v. Slater, 167 F. Supp. 2d 265, 277 (D.D.C. 2001) (plaintiffs alleged that specific "projects have been halted because of the new regulations"), rev'd on other grounds, 324 F.3d 752 (D.C. Cir. 2003).

B. <u>Plaintiffs' alleged injuries arising from the designation decision are not sufficiently imminent to be injuries-in-fact or sufficiently traceable to the challenged suitability determination.</u>

As discussed above, the specific injuries that Plaintiffs identify will come to pass only if the Proposed Segment is designated, not simply because of the suitability determination challenged here. Consequently, the chain of causation between the suitability determination and the injuries Plaintiffs assert is as follows: the Medford District has determined the Proposed Segment is suitable, then the State Director, National Director, and Secretary will agree and recommend the Proposed Segment for designation, then Congress will pass (and the President sign) a legislative act designating the Proposed Segment for protection, then Plaintiffs will seek to undertake an action (such as obtaining a permit for streambank stabilization or applying for a renewal of mining or grazing rights), and then the reviewing agency will deny the requested permit or otherwise prevent the action because of the statutory protections for a designated river. Unfortunately for Plaintiffs, this chain of causation is simply too attenuated to meet the requirements that Plaintiffs' injuries be imminent and fairly traceable to the challenged action.

As an initial matter, this causal chain in large part depends on the actions of third parties not before this Court. To reach the end of the chain, Congress, the President, and an agency (e.g., the Army Corps of Engineers) all must take a certain action. None of these entities are before the Court. In cases where an injury "turns on third party conduct," standing is "'ordinarily substantially more difficult to establish.'" <u>Arpaio</u>, 797 F.3d at 20 (quoting <u>Lujan</u>, 504 U.S. at 562). To show traceability, a plaintiff "bears 'the burden of adduc[ing] facts showing that those [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury." <u>Ctr. for Biological Diversity v. U.S. Dep't of Interior</u>, 563 F.3d 466, 478 (D.C. Cir. 2009) (alterations in original) (quoting <u>Lujan</u>, 504 U.S. at

562). And "declarations that a challenged policy '*could*' or '*may*' cause injury" are insufficient to establish standing "where injury . . . hinge[s] on the actions of third parties." Swanson Group Mfg. LLC v. Jewell, 790 F.3d 235, 242 (D.C. Cir. 2015) (citation omitted).

Plaintiffs fall short of meeting their burden to establish traceability here. For one, they allege no basis on which to conclude that the State Director, National Director, or Secretary of Interior will agree with the Bureau that the Proposed Segment is eligible and suitable for designation. When asked at the hearing, counsel for Plaintiffs indicated that neither Secretary Zinke nor the Trump Administration had taken a public position on the question. Nor do the Plaintiffs provide any reason to think that *Congress* would agree with the Bureau's conclusion and pass legislation designating the river. Plaintiffs do not, for instance, point to evidence showing that Congress regularly acts upon recommendations or adopts them, which might suggest that the Secretary's recommendation would likely be followed by Congress adopting legislation designating the segment. In any event, few things are more hypothetical and speculative than Congress passing a specific act of legislation.

And even if Congress did pass legislation designating the proposed segment, the statutory restrictions that Plaintiffs say would prohibit their potential activities are not *absolute*; they only prohibit actions that impair the Act's purposes. See, e.g., 16 U.S.C. § 1278(a). Agencies such as the Army Corps of Engineers can approve activities that will not impair the Act's purposes or harm the river's values and have done so in the past. See Nat'l Parks Conservation Ass'n v. Jewell, 965 F. Supp. 2d 67, 89–90 (D.D.C. 2013) (National Park Service granted permit to construct transmission line that impacted wild and scenic river); Coal. for Canyon Preservation, Inc. v. Hazen, 788 F. Supp. 1522, 1529–30 (D Mont. 1990) (Corps of Engineers granted permit to construct bridge across wild and scenic river). Similarly, the Oregon regulation concerning

16

water use permits only requires that a river's status as a wild and scenic river be taken into account; it does not prohibit any permits wholesale. See Or. Admin. R. 690-315-0040(4)(b). Plaintiffs do not explain why it is certainly likely that their permits would be denied given that such actions or permits *can* be approved. Thus, even the last link in the causal chain remains somewhat speculative. Plaintiffs therefore cannot establish traceability to the challenged action.

For similar reasons, Plaintiffs also fail to allege an injury that is sufficiently "imminent" to meet the requirements for an injury-in-fact. Since Plaintiffs complain of future injuries—*e.g.*, the denial of future permits for streambank stabilization or of future water rights transfers—they must demonstrate that the action is "'certainly impending'" for it to "constitute injury in fact." Whitmore v. Arkansas, 495 U.S. 149, 158 (1990). "And to 'shift[] injury from conjectural to imminent,' [Plaintiffs] must show that there is a 'substantial . . . probability' of injury." Chamber of Commerce of U.S. v. EPA, 642 F.3d 192, 200 (D.C. Cir. 2011) (first and third alterations in original) (citation omitted). Plaintiffs do not show that here. Indeed, Plaintiffs provide little support to show a substantial likelihood of each link in the chain of causation coming to pass, as discussed above.

Rather, Plaintiffs' descriptions of their injuries in their declarations and complaint have the sort of speculative, someday quality that typically precludes finding an injury-in-fact. They allege with respect to grazing rights, for instance, that following designation "[i]t is highly likely that . . . preservation groups will seek to curtail grazing on the allotments affecting" the relevant segment of the Rogue River. Decl. of Jerome Rosa ¶ 5. Similarly, they state that they will be "harmed by opposition from [the Bureau] when they attempt to secure an operating permit [from other agencies] for mining activities on lands within the segment." Decl. of Rich Angstrom ¶ 5. And they say that their "ability to make further changes to existing water rights . . . will likely be

17

limited under current protective management." Compl. ¶ 6. Nowhere do Plaintiffs indicate that they are currently attempting to renew grazing permits or seeking to secure mining permits or applying for permits for needed erosion prevention activities that will be denied—in fact, Plaintiffs' counsel acknowledged at the hearing that there are no pending permit applications to the Corps of Engineers or plans to imminently file any. This sort of someday speculation is not sufficiently imminent to constitute an injury-in-fact.

In sum, Plaintiffs' "protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged act[] to the asserted particularized injury." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc). In addition, "[t]he presence and number of third-party links in this causal chain independently corroborate that [Plaintiffs'] claim of causation is 'entirely speculative' and insufficient for standing." Id. (citation omitted).[8]

## IV. Conclusion

Plaintiffs contend that today's result means they will never be able to challenge the suitability determination and thereby prevent the river's designation. But this concern is overstated for two reasons. For one, the Court does not hold that *no* plaintiff could have challenged the suitability determination; rather, a party could have standing if it alleged a specific, concrete injury that arises from the suitability determination *independent of* any consequence of designation. The Court simply concludes that Plaintiffs have failed to do that.

---

[8] Because the Court concludes that Plaintiffs lack standing, it need not address the government's contention that dismissal is also proper due to the lack of final agency action, on ripeness grounds, or because of the statute of limitations.

Additionally, Plaintiffs' inability to challenge the ultimate designation question reflects the particular nature of this statutory scheme—namely, Congress's decision to keep the final say on designation for itself. Should Plaintiffs desire to prevent designation, they are free to use the ordinary political channels to influence the decision of the Secretary of Interior and, if necessary, Congress. But absent a specific injury flowing from the suitability determination itself, they lack standing to block a possible future designation by first undoing the suitability determination.

For the foregoing reasons, the Court will grant the government's Motion to Dismiss on the ground that Plaintiffs lack standing. A separate Order will accompany this Memorandum Opinion.[9]

CHRISTOPHER R. COOPER
United States District Judge

Date: January 18, 2018

---

[9] Since the Court is dismissing this case, it will also deny the prospective Defendant-Intervenors' Motion to Intervene as moot, as the parties indicated would be appropriate. See Defs.' Resp. to Mot. Intervene at 2–3; Rogue Riverkeeper's Reply to Defs.' Resp. at 2.